COURT OF APPEALS

                                       SECOND DISTRICT OF TEXAS

                                                   FORT WORTH

 

 

                                        NO. 2-09-136-CR

 

 

BENJAMIN
RAMIREZ A/K/A                                                   APPELLANT

PEDRO ARMENDAREZ A/K/A 

ESEQUEL PENA A/K/A EFREN 

LOPEZ A/K/A
RAUL PEREZ                                                                    

 

                                                   V.

 

THE STATE OF TEXAS                                                                STATE

 

                                              ------------

 

            FROM THE 362ND
DISTRICT COURT OF DENTON COUNTY

 

                                              ------------

 

                                MEMORANDUM OPINION[1]

                                              ------------

In three issues, appellant Benjamin Ramirez a/k/a
Pedro Armendarez a/k/a Esequel Pena a/k/a Efren Lopez a/k/a Raul Perez
(hereinafter ARamirez@) appeals his conviction for robbery.  We affirm. 









Background
Facts

On a late night in July 2008, Rudy Sandoval was
working at Pizza Patrón in Denton when he heard the door open, went toward the
front of the restaurant, and saw Ramirez wearing a wig, camouflage gloves, and
sunglasses.  While Ramirez was holding
his hand under his shirt to imply that he had a gun, he said in Spanish, AGive me the money.@  Ramirez
argued with Rudy briefly and then hit him in the face.  Rudy tried to tell Ramirez that he did not
have any money, but Ramirez said, AI=m not playing with you@ and threatened to kill Rudy.

Rudy and Ramirez began to fight.  As they were fighting, Stephanie Martinez,
who was also working at the restaurant, thought that she and Rudy were being
robbed.  Rudy told Stephanie that Ramirez
was trying to rob them, and Stephanie opened the cash register and gave Ramirez
a money tray.[2]
At that time, Rudy knocked out Ramirez, and the money tray fell to the
floor.








After Ramirez had been knocked out and his wig
had come off, Stephanie told Rudy to stop fighting, pulled Rudy off of Ramirez,
and started screaming, AThat=s my dad.@[3]  Rudy
wanted to call the police but Stephanie did not want to.  Rudy saw someone walking outside of the
restaurant and asked him to call the police.

Ramirez eventually ran away from the restaurant,
and the man who had called the police chased him.  Rudy went back inside the restaurant and
argued with Stephanie, who was upset and had called the restaurant=s owner but was trying to Acover@ for Ramirez.[4]

When the police apprehended Ramirez, he was
bleeding and was riding in a truck with Stephanie=s husband, Jose, and her mother, Sonia.  The police brought Ramirez back to the
restaurant, where Rudy identified him. 
Rudy also saw Jose and Sonia, who had been placed in separate police
cars.  The police officers who arrived at
the crime scene saw blood and money on the floor and took photographs that
showed, among other things, Ramirez=s wig, sunglasses, and a toy gun.








Several months later, a Denton County grand jury
indicted Ramirez for committing robbery; the indictment contained enhancement
paragraphs alleging that Ramirez had two prior felony convictions.  The trial court found that Ramirez was
indigent and therefore appointed counsel to represent him.

At trial, Ramirez pled not guilty, but the jury
found him guilty.  After the jury heard
evidence from several witnesses about matters concerning Ramirez=s punishment, it found the enhancement
allegations in the indictment to be true and assessed sixty years= confinement. 
Ramirez filed a motion for new trial and his notice of appeal.

Evidentiary
Sufficiency

In his first issue, Ramirez contends that the
evidence is legally and factually insufficient to prove that he committed
robbery.

Standards
of review and applicable law








In reviewing the legal sufficiency of the
evidence to support a conviction, we view all of the evidence in the light most
favorable to the prosecution in order to determine whether any rational trier
of fact could have found the essential elements of the crime beyond a
reasonable doubt.  Jackson v. Virginia,
443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); Clayton v. State, 235
S.W.3d 772, 778 (Tex. Crim. App. 2007). 
This standard gives full play to the responsibility of the trier of fact
to resolve conflicts in the testimony, to weigh the evidence, and to draw
reasonable inferences from basic facts to ultimate facts.  Jackson, 443 U.S. at 319, 99 S. Ct. at
2789; Clayton, 235 S.W.3d at 778. 


The trier of fact is the sole judge of the weight
and credibility of the evidence.  See
Tex. Code Crim. Proc. Ann. art. 38.04 (Vernon 1979); Brown v. State, 270
S.W.3d 564, 568 (Tex. Crim. App. 2008), cert. denied, 129 S. Ct. 2075
(2009).  Thus, when performing a legal
sufficiency review, we may not re-evaluate the weight and credibility of the
evidence and substitute our judgment for that of the factfinder.  Dewberry v. State, 4 S.W.3d 735, 740
(Tex. Crim. App. 1999), cert. denied, 529 U.S. 1131 (2000).  We must presume that the factfinder resolved
any conflicting inferences in favor of the prosecution and defer to that
resolution.  Jackson, 443 U.S. at
326, 99 S. Ct. at 2793; Clayton, 235 S.W.3d at 778. 








When reviewing the factual sufficiency of the
evidence to support a conviction, we view all the evidence in a neutral light,
favoring neither party. Steadman v. State, 280 S.W.3d 242, 246 (Tex.
Crim. App. 2009); Watson v. State, 204 S.W.3d 404, 414 (Tex. Crim. App.
2006).  We then ask whether the evidence
supporting the conviction, although legally sufficient, is nevertheless so weak
that the factfinder=s
determination is clearly wrong and manifestly unjust or whether conflicting
evidence so greatly outweighs the evidence supporting the conviction that the
factfinder=s
determination is manifestly unjust.  Steadman, 280 S.W.3d at 246; Watson,
204 S.W.3d at 414B15,
417.

Unless we conclude that it is necessary to
correct manifest injustice, we must give due deference to the factfinder=s determinations, Aparticularly those determinations concerning the
weight and credibility of the evidence.@  Johnson
v. State, 23 S.W.3d 1, 9 (Tex. Crim. App. 2000); see Steadman, 280
S.W.3d at 246.  Evidence is always
factually sufficient when it preponderates in favor of the conviction.  Steadman, 280 S.W.3d at 247; see
Watson, 204 S.W.3d at 417.  








A person commits theft if the person Aunlawfully appropriates property with intent to
deprive the owner of property.@  Tex.
Penal Code Ann. ' 31.03(a)
(Vernon Supp. 2009).  A person commits
robbery if, in the course of committing theft and with intent to obtain or
maintain control of property, the person intentionally, knowingly, or
recklessly causes bodily injury to another or intentionally or knowingly
threatens or places another in fear of imminent bodily injury or death.  Id. ' 29.02(a) (Vernon 2003); see Cooper v.
State, 67 S.W.3d 221, 222 (Tex. Crim. App. 2002).  The penal code defines Ain the course of committing theft@ as Aconduct that occurs in an attempt to commit,
during the commission, or in immediate flight after the attempt or commission of
theft.@  Tex.
Penal Code Ann. '
29.01(1) (Vernon 2003).  Thus, Athe State is not required to show a completed
theft to establish the corpus delicti of robbery.@  Llamas
v. State, 270 S.W.3d 274, 279 (Tex. App.CAmarillo 2008, no pet.).

Analysis

The evidence
that is detailed above shows that while attempting to take Pizza Patrón=s money with the intent to deprive the owner of the money, Ramirez
intentionally or knowingly threatened or placed another in fear of imminent
bodily injury or death and therefore committed robbery.  See Tex. Penal Code Ann. '' 29.01(1), 29.02(a). 
Specifically, the evidence establishes that while disguised and while
implying that he had a gun, Ramirez fought with and threatened to kill Rudy
after Ramirez said, AGive me the money@ and  AI=m not playing with you,@ and the
evidence shows that Ramirez then had a money tray in his hands before Rudy
knocked him out.  The evidence also
proves that both Rudy and Stephanie believed that they were being robbed.

 








Despite this evidence, Ramirez presented the
testimony of Sonia, his wife, to offer an alternate theory about why the events
at Pizza Patrón occurred. Sonia, who had been married to Ramirez for twenty-one
years at the time of the trial, testified that although Stephanie was married to
Jose, Rudy had been calling and spending time with Stephanie (Sonia and Ramirez=s daughter). Sonia said that she told
Ramirez about Rudy=s
relationship with Stephanie even though she was fearful about how Ramirez would
react.

According to Sonia, when Ramirez learned about
the relationship approximately a week before the incident at Pizza Patrón, he
became angry and said Athat
he was going to get@
and Ahit@ Rudy. 
Sonia testified that on the day of the incident, Ramirez became
drunk.  She also said that when Ramirez
got out of the truck on the night of the incident a block away from Pizza
Patrón and said, AWait
for me,@ she did not know where he was going and did not
see his wig, sunglasses, or toy gun. 
Stephanie confirmed that she had separated from Jose, that Rudy had been
calling her and that she had seen a movie with him, that Sonia had become upset
about her relationship with Rudy, and that Ramirez was a strict father.








Ramirez contends that the evidence is not legally
or factually sufficient to prove robbery because he argues that when considered
together, Sonia=s
testimony, Stephanie=s
testimony about her relationship with Rudy, the fact that Ramirez went to a
restaurant where his daughter was working, and the fact that he did not go Astraight for the cash register@ upon entering Pizza Patrón shows that he did not
intend to deprive anyone of money but intended only to assault Rudy.  But Ramirez=s intent to steal may be inferred from
circumstantial evidence such as his conduct.  See McGee v. State, 774 S.W.2d 229, 234
(Tex. Crim. App. 1989), cert. denied, 494 U.S. 1060 (1990); Roper v.
State, 917 S.W.2d 128, 132 (Tex. App.CFort Worth 1996, pet. ref=d).  And in
our legal sufficiency review, when faced with a record that supports
conflicting inferences about Ramirez=s intent, we must presumeCeven if it does not affirmatively appear in the
recordCthat the jury resolved any such conflict in favor
of the prosecution, and must defer to that resolution.  Matson v. State, 819 S.W.2d 839, 846
(Tex. Crim. App. 1991); Connell v. State, 233 S.W.3d 460, 466B67 (Tex. App.CFort Worth 2007, no pet.).

When viewing the evidence in the light most
favorable to the prosecution (as we must in our legal sufficiency review), the
circumstances that were established by Rudy=s and Stephanie=s testimony about what happened on the night in
question, as described above, were adequate to allow the jury to infer Ramirez=s intent to take money from Pizza Patrón, and we
must presume that the jury resolved the conflicting inferences about his intent
that were created by other evidence in favor of convicting him and defer to
that resolution.  See Jackson, 443
U.S. at 319, 99 S. Ct. at 2789; Matson, 819 S.W.2d at 846. Therefore, we
hold that the evidence is legally sufficient to prove that Ramirez committed
robbery and overrule that portion of his first issue.








Similarly, viewing the evidence in a neutral
light, we cannot conclude that the jury=s implicit determination that Ramirez intended to
take the money is clearly wrong or manifestly unjust.  See Steadman, 280 S.W.3d at 246; Watson,
204 S.W.3d at 414B15,
417.  The jury was not required to
believe any of Sonia=s
testimony.  See Hernandez v. State,
161 S.W.3d 491, 500 (Tex. Crim. App. 2005); Jones v. State, 984 S.W.2d
254, 257 (Tex. Crim. App. 1998).  The
jury had a reason not to believe her testimony, which served to imply that
Ramirez wanted only to assault Rudy, because even after Rudy had knocked
Ramirez out and Ramirez had regained some of his awareness, as Stephanie tried
to pick him up, he said, AGive
me the money@
and asked her, AWhere=s the money?@ 
Furthermore, even if the jury had believed Sonia=s testimony and found that Ramirez was angry at
Rudy before entering the restaurant, his desire to Aget@ or Ahit@ Rudy does not explain why he would do so under
disguise while pretending to be engaged in robbery.  Similarly, Ramirez=s desire to Aget@ or Ahit@ Rudy also does not necessarily preclude his
accompanying desire to steal the restaurant=s money; he could have accomplished both goals at
the same time.








For these reasons, giving Aa great degree of deference@ to the jury=s determination of guilt, we hold that the proof
that Ramirez went into the restaurant in disguise, demanded money under threats
and with assaultive behavior, and had money in his hands before being knocked
out comprises factually sufficient evidence to support his robbery
conviction.  See Steadman,
280 S.W.3d at 246.  Therefore, we
overrule his first issue.

Ramirez=s Requests to Change Counsel

In his second issue, Ramirez contends that the
trial court erred by denying his requests to change the counsel who was
appointed for him.  We broadly construe
this issue as challenging the trial court=s decision, made weeks before trial, to deny
Ramirez=s request for different appointed counsel and
also as challenging the court=s decision, made on the day of trial, to deny his
request for more time to replace his appointed counsel with retained counsel.

Substitution
of appointed counsel   

At a pretrial hearing about a month before trial,
Ramirez=s appointed counsel told the trial court that
Ramirez desired a different attorney. 
Ramirez then explained to the court that he was confused about what his
counsel had told him about the range of punishment for an unrelated offense:

[THE
DEFENDANT:]  With the attorney present,
we have not had good communication.  That
is the reason.  I have nothing against
him.  The only thing is the communication,
that it hasn=t ‑‑ I have a case that, Judge, during the arraignment says
to me it is a  lower case, but because of
my record, it was put on a state jail felony. 









The attorney
here present came to talk to me about that cause.  And I said it was a misdemeanor, but the
judge placed it as a state jail felony. 
The maximum sentence that you can get is six months to two years.  And the attorney present says to me ‑‑
with that same cause and says to me you can get up to 26 years.[[5]]

 

. . . .

 

THE
COURT:  Why do you need another attorney?

 

THE
DEFENDANT:  I have had on other occasions
other attorneys where we have had good communication.  And with this attorney, it=s completely the opposite.  He
is stuck on this and this, on this, and he doesn=t change.

 

THE
COURT:  Do you have the funds to hire
your own attorney?

 

THE
DEFENDANT:  No.  If I had it, I would have already tried to do
it.

 

THE
COURT:  Well, that=s the problem.  When you have a
court‑appointed attorney, then you=re ‑‑
I have to go down the list, like the legislature requires me, and I=ll appoint an attorney on that list. 
And if they=re not qualified, then I won=t appoint
them. But Mr. Sain is a very qualified attorney, and I have full
confidence in his abilities.

 

THE
DEFENDANT:  Yes, but in this opportunity,
I am the defendant, and I can see that he=s not doing
his job.

 

THE
COURT:  How do you say he=s not doing his job?

 








THE
DEFENDANT:  Look, look, missus, when this
charge started, I said to him such and such. 
I have a lot of witnesses. Why don=t you think
about getting an investigator?  The court
is not going to give me an investigator. 
And it=s just negative things that he=s bringing
along.  

Now, I am a
man that if I made mistakes, it is not necessary to have a trial.  But ever since day one when I saw him, he
started talking to me about a trial.  And
that is why.  It=s his decision. He=s not
considering me.

 

THE
COURT:  Do you want a trial?

 

THE DEFENDANT:  No.  I
want ‑‑ if the judge, if the court, if we reach an agreement, at no
point did I say to the attorney let=s have a jury,
let=s take it to the jury.

 

. . . .

 

THE
COURT:  Okay.  Mr. Ramirez, I=m going to deny your request to give you a new attorney.  You may not like what your attorney tells
you, but he=s giving you advice.  Whether
you follow that advice or not, that=s completely
up to you.  But he will be your attorney,
and you need to talk to him because he will be the one preparing your case and
taking it to trial.

I=m very confident in his skills as an attorney; otherwise, I wouldn=t have appointed him.  He=s got an investigator. He=s working
with the investigator on your case.  I
don=t see that he=s not doing his job or anything that would require his removal.
Therefore, I=m denying your request.

 








The code of criminal procedure authorizes the
replacement of appointed counsel for good cause.  See Tex. Code Crim. Proc. Ann. art.
26.04(j)(2) (Vernon Supp. 2009). 
However, A[a]ppointment
of new counsel is a matter solely within the discretion of the trial court,@ and the Atrial court is under no duty to search for a
counsel until an attorney is found who is agreeable to the accused.@  Solis
v. State, 792 S.W.2d 95, 100 (Tex. Crim. App. 1990); see King
v. State, 29 S.W.3d 556, 566 (Tex. Crim. App. 2000).  AA defendant does not have the right to choose
appointed counsel, and unless he waives his right to counsel and chooses to
represent himself, or shows adequate reasons for the appointment of new
counsel, he must accept court‑appointed counsel.@ Maes v. State, 275 S.W.3d 68, 71 (Tex.
App.CSan Antonio 2008, no pet.); see Renfro v.
State, 586 S.W.2d 496, 499B500 (Tex. Crim. App. [Panel Op.] 1979); Trammell
v. State, 287 S.W.3d 336, 343 (Tex. App.CFort Worth 2009, no pet.) (ATexas courts have specifically held that an
indigent defendant does not have a right to the counsel of his own choosing.@).

The defendant has the burden to prove that he is
entitled to new appointed counsel.  See Stephenson v. State, 255 S.W.3d 652,
655B56 (Tex. App.CFort Worth 2008, pet. ref=d) (mem. op.). 
Vague or conclusory allegations are generally insufficient to carry the
defendant=s
burden.  Id.; see Maes,
275 S.W.3d at 71B72.









We conclude that Ramirez did not meet his burden
to show that he was entitled to different appointed counsel.  Although he was confused about his range of
punishment for an unrelated offense, the trial court explained that range of
punishment to him.  Also, despite Ramirez=s assertions that he did not have Agood communication@[6] with his counsel and that his counsel Awas not doing his job@ because, in part, Ramirez alleged that his
counsel had not obtained an investigator, Ramirez was not aware that his
counsel gained the trial court=s approval to hire an investigator months
earlier.[7]  Finally, although Ramirez said that he did
not want to have a trial or take his case Ato the jury,@ Ramirez conceded that his counsel had told him
about a twenty-year plea bargain offer and that he had rejected the offer.[8]  For these reasons, we hold that Ramirez did
not establish good cause for the appointment of different counsel and overrule
Ramirez=s second issue to the extent that it challenges
the trial court=s
decision not to appoint different counsel for him.








More
time to obtain retained counsel    

On April 17, 2009, just a few days before Ramirez=s trial was set to begin, his counsel tried to
visit with him, but Ramirez refused to talk to his counsel and told him that he
was fired.  Then, on April 20, the day
that Ramirez=s
trial was set to begin, Ramirez=s counsel filed a motion to withdraw on the basis
that Ramirez wanted to represent himself. 
Before voir dire began that day, the following exchange occurred:

THE
COURT:  Mr. Ramirez, why is it that you
don=t want to have Mr. Sain as your attorney[?]

 

. . . .

 

THE
DEFENDANT:  The decision, the attorney
here present, he made the decision of making it ‑‑ of passing it in
front of a jury.

 

. . . .

 

THE
DEFENDANT:  I never said to [Ramirez=s counsel] . . . that I wanted a jury trial.  We never had a good conversation with the
attorney. . . . 

 

. . . .

 

THE COURT: 
Well, let me ask you this, Mr. Ramirez. Your choices are to have a
jury to determine whether you=re guilty or not. 
Or if you choose, I can listen to the evidence and determine whether you=re guilty or not. 
So basically, those are your two choices, and you still have those two
choices today.  

. . . .

 








THE
DEFENDANT:  No, I=m asking ‑‑ I=m asking for
an opportunity to hire an attorney.  I
know that the judge or the Court is not allowed to have a case such as this, a
felony, without an attorney.  That=s why I=m asking ‑‑ I=m in
jail.  I have the opportunity to sell the
‑‑ occasion to sell the house that I have in Mexico and to hire my
attorney, so that I can be happy with the decision of the Court.

 

THE
COURT:  Well, back on March 27th, 2009,
almost a month ago, I told you that you were free to go out and hire your own
attorney.  What have you done with regard
to hiring your own attorney since then?

 

THE
DEFENDANT:  Look, on that occasion, the
attorney was going to send an investigator to visit me.  And I waited for the news of the investigator
and the attorney.  It was last week on
Friday, last Friday, when he came to visit me. 
I said, no, you had time to let me know. 
And now, Monday, we=re going to
court, it=s been nine months since I=ve been in
jail.  I gave him evidence, witnesses to
the attorney, and he didn=t gather them up. . . .

 

. . . .

THE
COURT:  Let me ask you, Have you made any
attempts to hire your own counsel since I talked to you about it last month?

 

THE
DEFENDANT:  No, look, I haven=t done it . . . .

 

. . . .

 








THE
COURT:  All right.  Just because you=re unhappy with some things that your attorney has said[[9]]
is not sufficient for me to order that you get a new attorney.  He=s given you
his opinion on things.  He=s given you his recommendations. . . . 
But at this point, it=s past the
time, we=re set for jury trial today, and so I=m not going to allow him to withdraw.

If you had another attorney that you previously
hired, ready to go to trial today, I would let you substitute your own attorney
in.  I believe that=s similar to what I told you last month when we
had the hearing.  

After
Ramirez made a final request for one or two weeks= delay of his trial and the trial court denied
the request, Ramirez again refused a plea bargain offer from the State and
chose the jury to assess his guilt and punishment.








The federal and Texas constitutions guarantee the
right to counsel in criminal cases and contemplate the qualified right to
obtain paid, nonappointed counsel of the defendant=s choosing. 
See United States v. Gonzalez‑Lopez, 548 U.S. 140, 151B52, 126 S. Ct. 2557, 2565B66 (2006); Gonzalez v. State, 117 S.W.3d
831, 836B37 (Tex. Crim. App. 2003).  The right to counsel of the defendant=s choosing is not absolute, and a defendant
cannot wait until the day of trial to demand different counsel or to request
that counsel be dismissed so that he may retain other counsel.  See Gonzalez, 117 S.W.3d at 837; Neal
v. State, 689 S.W.2d 420, 427 (Tex. Crim. App. 1984) (stating that Aan accused . . . may not use his
constitutional right to counsel so as to manipulate the commencement of his
trial to suit his convenience and pleasure@), cert. denied, 474 U.S. 818 (1985);
Webb v. State, 533 S.W.2d 780, 784 (Tex. Crim. App. 1976) (explaining that
an Aaccused=s right to represent himself or select his own
counsel cannot be manipulated so as to obstruct the orderly procedure in the
courts or to interfere with the fair administration of justice@).

In deciding whether to grant a continuance
because of the absence of the defendant=s choice of counsel, the trial court should weigh
the following nonexclusive factors:  (1)
the length of delay requested; (2) whether other continuances were requested
and whether they were denied or granted; (3) the length of time in which the
defendant=s
counsel had to prepare for trial; (4) whether another competent attorney
was prepared to try the case; (5) the balanced convenience or inconvenience to
the witnesses, the opposing counsel, and the trial court; (6) whether the delay
was for legitimate or contrived reasons; (7) whether the case was complex or
simple; (8) whether the denial of the motion resulted in some identifiable harm
to the defendant; and (9) the quality of legal representation actually
provided.  Ex parte Windham, 634
S.W.2d 718, 720 (Tex. Crim. App. 1982). 
We must determine whether the trial court could reasonably have balanced
these factors and concluded that the fair and efficient administration of
justice weighed more heavily than Ramirez=s right to counsel of his choice.  See Rosales v. State, 841 S.W.2d 368,
375 (Tex. Crim. App. 1992), cert. denied, 510 U.S. 949 (1993).








Here, although Ramirez requested only a one or
two week delay of his trial, the trial court could have reasonably concluded
that the delay would have been much longer because there is no indication that
Ramirez had contacted or even researched any particular attorney to handle his
case even though he had known for close to a month that he wanted a different
attorney.  Similarly, nothing in the
record shows that Ramirez had money to retain an attorney within the requested
delay period (he told the trial court just weeks earlier that he did not have
funds to hire an attorney), and the trial court could have been reasonably
dubious about Ramirez=s
potential to sell his house in Mexico within two weeks to gain such money.

Ramirez=s counsel was appointed in July 2008, so he had
about nine months to prepare for the April 20, 2009 trial.  The State had served subpoenas for Ramirez=s trial date and had several civilian and law
enforcement witnesses prepared to testify on that date.








While the record does not indicate that Ramirez=s requested delay was sought for illegitimate
reasons or that his robbery case was substantially complex, Ramirez has not
adequately identified any particular decision of his appointed counsel, related
either to overall strategy or specific tactics during the trial, that resulted
in identifiable harm.  Although Ramirez
argues in his brief that his appointed counsel=s representation Aaffected his ability to accept or decline the
State=s plea bargain offer of twenty years,@ the record shows that before voir dire began,
Ramirez=s counsel obtained a brief recess from the trial
court to discuss a plea bargain offer with Ramirez and that Ramirez rejected
the offer. Finally, we have not noticed any part of the record showing that
Ramirez=s appointed counsel provided ineffective
representation, and Ramirez has not raised ineffective assistance as an issue
on appeal. 

For these reasons, we hold that the trial court
could reasonably have balanced the Windham factors and concluded that
the fair and efficient administration of justice weighed more heavily than
Ramirez=s right to counsel of his choice.  See Windham, 634 S.W.2d at 720; Rosales,
841 S.W.2d at 375.  Accordingly, we hold
that the trial court did not err by denying Ramirez=s motion for more time to retain counsel, and we
overrule the remaining portion of his second issue. 

Ramirez=s Objection to the Courthouse=s Display

 

In his third issue, Ramirez argues that the trial
court erred by denying his motion for a mistrial because of the courthouse=s allegedly prejudicial display that the jury
panel might have seen.  He asserts that
the display affected his right to a trial before an impartial jury under the
Sixth Amendment.  See U.S. Const.
amend. VI; State v. Morales, 253 S.W.3d 686, 694 (Tex. Crim. App. 2008)
(discussing the Sixth Amendment=s Apromise of >an impartial jury=@).

During a break in the parties= voir dire of the jury panel, the following
colloquy occurred:








[DEFENSE
COUNSEL]:  Judge, it=s come to my attention, there=s a victim=s display down in the first floor. 
I think it=s put on by the D.A.=s, I'm not
sure.  But there=s a display there honoring victims, something like that.  And so I would urge that [the display] is
prejudicial to the jury panel as they walk in and urge a motion for new trial.

 

THE
COURT:  Remind me when we come back from
lunch, I=ll go down and take a look at it.

 

The
trial court took its lunch break, and when the trial resumed, the judge said, ADuring the lunch break, I went downstairs and
viewed any displays downstairs.  Based on
my viewing, I=m
going to deny the motion for mistrial.@

As we
explained in Grotti v. State, 

 

A mistrial is
an extreme remedy for prejudicial events occurring during the trial
process.  It is a device used to halt
trial proceedings when error is so prejudicial that expenditure of further time
and expense would be wasteful and futile. . . . 
Only when it is apparent that an objectionable event at trial is so
emotionally inflammatory that curative instructions are not likely to prevent
the jury from being unfairly prejudiced against the defendant is a trial court
required to grant a mistrial.

The denial of
a motion for mistrial is reviewed under an abuse of discretion standard.  The determination of whether a given error
necessitates a mistrial must be made by examining the particular facts of the
case.

 

209
S.W.3d 747, 776 (Tex. App.CFort Worth 2006) (citations omitted), aff=d,
273 S.W.3d 273 (Tex. Crim. App. 2008); see Ladd v. State, 3 S.W.3d 547,
567 (Tex. Crim. App. 1999), cert. denied, 529 U.S. 1070 (2000).








Ramirez did not present any evidence about the
specific contents of the display to show that it was emotionally
inflammatory.  He also did not show the
proximity of the display to the courtroom where his trial occurred (other than
that the display was Adown
in the first floor@),
whether members of the jury panel had to pass by the display to get to the
courtroom where the trial occurred, whether any of the members of the jury
panel actually noticed the display, or, if they did notice it, how it affected
them to the extent that they would have been unfairly prejudiced against
him.  Under this record, we cannot
conclude that the trial court abused its discretion by denying Ramirez=s motion for mistrial.  See Grotti, 209 S.W.3d at 776; Torres
v. State, 109 S.W.3d 602, 604B05 (Tex. App.CFort Worth 2003, no pet.) (overruling an
appellant=s
complaint in a DWI case about anti-DWI posters that were located in the lobby
of the building in which the appellant=s trial occurred because the appellant did not
show that any of the jury=s
members were prejudiced by the posters); see also Baker v. State, 797
S.W.2d 406, 408 (Tex. App.CFort Worth 1990, pet. ref=d) (overruling a challenge to the trial court=s denial of a motion for mistrial because the
appellant did not meet his Aburden to ensure that the activity of which he
complain[ed] was made part of a complete record@).  We
overrule Ramirez=s
third issue.








                                             Conclusion

Having overruled each of Ramirez=s three issues, we affirm the trial court=s judgment.

 

 

TERRIE
LIVINGSTON

CHIEF JUSTICE

 

PANEL: 
LIVINGSTON, C.J.; WALKER and MCCOY, JJ.

 

DO NOT PUBLISH

Tex. R. App. P. 47.2(b)

 

DELIVERED: 
May 13, 2010

 

 

 











[1]See Tex. R. App. P. 47.4.





[2]Stephanie said that it was Apossible@ that Ramirez was trying to push the money tray back when she tried to
give it to him.





[3]Because of differences in Rudy=s and
Stephanie=s testimony, the record is unclear about whether Stephanie opened the
cash register before or after she was aware that the man who was fighting with
Rudy was her father. The video of the incident shows that Ramirez=s wig came off before Stephanie opened the register and before Rudy
knocked Ramirez out.





[4]The restaurant=s owner testified that no substantial amount of money had been taken
from the register.





[5]The record reflects that Ramirez was charged in a separate case with
theft (not associated with the events at Pizza Patrón) that ordinarily would
have been a misdemeanor but was charged as a state jail felony and then
enhanced further as to Ramirez=s punishment
range because of his multiple prior convictions.





[6]Ramirez has neither generally claimed that his appointed counsel was
ineffective at trial nor adequately specified how his allegedly poor
communication with his appointed counsel negatively impacted any particular
portion of his trial.  See Malcom v.
State, 628 S.W.2d 790, 792 (Tex. Crim. App. [Panel Op.] 1982) (relating
that when a change of appointed counsel is requested but not given, courts
should examine the record for whether the appointed counsel=s representation had a negative impact on the trial).





[7]Ramirez=s counsel affirmed that he had met the investigator, had given the
investigator the video of Ramirez=s robbery and
had given the investigator witness interview assignments, and was satisfied
with the investigator=s progress.  Ramirez said that
the investigator had not yet spoken with him or Stephanie but admitted that he
did not know of other actions that the investigator might have taken.





[8]As described below, Ramirez eventually elected the jury to decide his
guilt and punishment rather than the trial court.





[9]Ramirez complained to the trial court about a comment allegedly made
by his counsel to Ramirez=s family about Ramirez=s accepting
the State=s plea bargain offer so that his family Awould have the opportunity to see [Ramirez] die outside@ of prison.