

# COURT OF APPEALS

## SECOND DISTRICT OF TEXAS
## FORT WORTH

NO. 2-09-136-CR

BENJAMIN RAMIREZ A/K/A                                      APPELLANT
PEDRO ARMENDAREZ A/K/A
ESEQUEL PENA A/K/A EFREN
LOPEZ A/K/A RAUL PEREZ

V.

THE STATE OF TEXAS                                              STATE

------------

FROM THE 362ND DISTRICT COURT OF DENTON COUNTY

------------

## MEMORANDUM OPINION[1]

------------

In three issues, appellant Benjamin Ramirez a/k/a Pedro Armendarez a/k/a

Esequel Pena a/k/a Efren Lopez a/k/a Raul Perez (hereinafter "Ramirez") appeals

his conviction for robbery.  We affirm.

---

[1] ... *See* Tex. R. App. P. 47.4.

Background Facts

On a late night in July 2008, Rudy Sandoval was working at Pizza Patrón in Denton when he heard the door open, went toward the front of the restaurant, and saw Ramirez wearing a wig, camouflage gloves, and sunglasses. While Ramirez was holding his hand under his shirt to imply that he had a gun, he said in Spanish, "Give me the money." Ramirez argued with Rudy briefly and then hit him in the face. Rudy tried to tell Ramirez that he did not have any money, but Ramirez said, "I'm not playing with you" and threatened to kill Rudy.

Rudy and Ramirez began to fight. As they were fighting, Stephanie Martinez, who was also working at the restaurant, thought that she and Rudy were being robbed. Rudy told Stephanie that Ramirez was trying to rob them, and Stephanie opened the cash register and gave Ramirez a money tray.[2] At that time, Rudy knocked out Ramirez, and the money tray fell to the floor.

After Ramirez had been knocked out and his wig had come off, Stephanie told Rudy to stop fighting, pulled Rudy off of Ramirez, and started screaming, "That's my dad."[3] Rudy wanted to call the police but Stephanie did not want

---

[2] Stephanie said that it was "possible" that Ramirez was trying to push the money tray back when she tried to give it to him.

[3] Because of differences in Rudy's and Stephanie's testimony, the record is unclear about whether Stephanie opened the cash register before or

to. Rudy saw someone walking outside of the restaurant and asked him to call the police.

Ramirez eventually ran away from the restaurant, and the man who had called the police chased him. Rudy went back inside the restaurant and argued with Stephanie, who was upset and had called the restaurant's owner but was trying to "cover" for Ramirez.[4]

When the police apprehended Ramirez, he was bleeding and was riding in a truck with Stephanie's husband, Jose, and her mother, Sonia. The police brought Ramirez back to the restaurant, where Rudy identified him. Rudy also saw Jose and Sonia, who had been placed in separate police cars. The police officers who arrived at the crime scene saw blood and money on the floor and took photographs that showed, among other things, Ramirez's wig, sunglasses, and a toy gun.

Several months later, a Denton County grand jury indicted Ramirez for committing robbery; the indictment contained enhancement paragraphs alleging

---

after she was aware that the man who was fighting with Rudy was her father. The video of the incident shows that Ramirez's wig came off before Stephanie opened the register and before Rudy knocked Ramirez out.

[4] ... The restaurant's owner testified that no substantial amount of money had been taken from the register.

that Ramirez had two prior felony convictions. The trial court found that Ramirez was indigent and therefore appointed counsel to represent him.

At trial, Ramirez pled not guilty, but the jury found him guilty. After the jury heard evidence from several witnesses about matters concerning Ramirez's punishment, it found the enhancement allegations in the indictment to be true and assessed sixty years' confinement. Ramirez filed a motion for new trial and his notice of appeal.

## Evidentiary Sufficiency

In his first issue, Ramirez contends that the evidence is legally and factually insufficient to prove that he committed robbery.

### Standards of review and applicable law

In reviewing the legal sufficiency of the evidence to support a conviction, we view all of the evidence in the light most favorable to the prosecution in order to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). This standard gives full play to the responsibility of the trier of fact to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to

ultimate facts. *Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Clayton*, 235 S.W.3d at 778.

The trier of fact is the sole judge of the weight and credibility of the evidence. *See* Tex. Code Crim. Proc. Ann. art. 38.04 (Vernon 1979); *Brown v. State*, 270 S.W.3d 564, 568 (Tex. Crim. App. 2008), *cert. denied*, 129 S. Ct. 2075 (2009). Thus, when performing a legal sufficiency review, we may not re-evaluate the weight and credibility of the evidence and substitute our judgment for that of the factfinder. *Dewberry v. State*, 4 S.W.3d 735, 740 (Tex. Crim. App. 1999), *cert. denied*, 529 U.S. 1131 (2000). We must presume that the factfinder resolved any conflicting inferences in favor of the prosecution and defer to that resolution. *Jackson*, 443 U.S. at 326, 99 S. Ct. at 2793; *Clayton*, 235 S.W.3d at 778.

When reviewing the factual sufficiency of the evidence to support a conviction, we view all the evidence in a neutral light, favoring neither party. *Steadman v. State*, 280 S.W.3d 242, 246 (Tex. Crim. App. 2009); *Watson v. State*, 204 S.W.3d 404, 414 (Tex. Crim. App. 2006). We then ask whether the evidence supporting the conviction, although legally sufficient, is nevertheless so weak that the factfinder's determination is clearly wrong and manifestly unjust or whether conflicting evidence so greatly outweighs the evidence supporting the conviction that the factfinder's determination is

5

manifestly unjust. *Steadman*, 280 S.W.3d at 246; *Watson*, 204 S.W.3d at 414–15, 417.

Unless we conclude that it is necessary to correct manifest injustice, we must give due deference to the factfinder's determinations, "particularly those determinations concerning the weight and credibility of the evidence." *Johnson v. State*, 23 S.W.3d 1, 9 (Tex. Crim. App. 2000); *see Steadman*, 280 S.W.3d at 246. Evidence is always factually sufficient when it preponderates in favor of the conviction. *Steadman*, 280 S.W.3d at 247; *see Watson*, 204 S.W.3d at 417.

A person commits theft if the person "unlawfully appropriates property with intent to deprive the owner of property." Tex. Penal Code Ann. § 31.03(a) (Vernon Supp. 2009). A person commits robbery if, in the course of committing theft and with intent to obtain or maintain control of property, the person intentionally, knowingly, or recklessly causes bodily injury to another or intentionally or knowingly threatens or places another in fear of imminent bodily injury or death. *Id.* § 29.02(a) (Vernon 2003); *see Cooper v. State*, 67 S.W.3d 221, 222 (Tex. Crim. App. 2002). The penal code defines "in the course of committing theft" as "conduct that occurs in an attempt to commit, during the commission, or in immediate flight after the attempt or commission of theft." Tex. Penal Code Ann. § 29.01(1) (Vernon 2003). Thus, "the State

6

is not required to show a completed theft to establish the *corpus delicti* of robbery." *Llamas v. State*, 270 S.W.3d 274, 279 (Tex. App.—Amarillo 2008, no pet.).

Analysis

The evidence that is detailed above shows that while attempting to take Pizza Patrón's money with the intent to deprive the owner of the money, Ramirez intentionally or knowingly threatened or placed another in fear of imminent bodily injury or death and therefore committed robbery. *See* Tex. Penal Code Ann. §§ 29.01(1), 29.02(a). Specifically, the evidence establishes that while disguised and while implying that he had a gun, Ramirez fought with and threatened to kill Rudy after Ramirez said, "Give me the money" and "I'm not playing with you," and the evidence shows that Ramirez then had a money tray in his hands before Rudy knocked him out. The evidence also proves that both Rudy and Stephanie believed that they were being robbed.

Despite this evidence, Ramirez presented the testimony of Sonia, his wife, to offer an alternate theory about why the events at Pizza Patrón occurred. Sonia, who had been married to Ramirez for twenty-one years at the time of the trial, testified that although Stephanie was married to Jose, Rudy had been calling and spending time with Stephanie (Sonia and Ramirez's daughter).

Sonia said that she told Ramirez about Rudy's relationship with Stephanie even though she was fearful about how Ramirez would react.

According to Sonia, when Ramirez learned about the relationship approximately a week before the incident at Pizza Patrón, he became angry and said "that he was going to get" and "hit" Rudy. Sonia testified that on the day of the incident, Ramirez became drunk. She also said that when Ramirez got out of the truck on the night of the incident a block away from Pizza Patrón and said, "Wait for me," she did not know where he was going and did not see his wig, sunglasses, or toy gun. Stephanie confirmed that she had separated from Jose, that Rudy had been calling her and that she had seen a movie with him, that Sonia had become upset about her relationship with Rudy, and that Ramirez was a strict father.

Ramirez contends that the evidence is not legally or factually sufficient to prove robbery because he argues that when considered together, Sonia's testimony, Stephanie's testimony about her relationship with Rudy, the fact that Ramirez went to a restaurant where his daughter was working, and the fact that he did not go "straight for the cash register" upon entering Pizza Patrón shows that he did not intend to deprive anyone of money but intended only to assault Rudy. But Ramirez's intent to steal may be inferred from circumstantial evidence such as his conduct. *See McGee v. State*, 774 S.W.2d

8

229, 234 (Tex. Crim. App. 1989), *cert. denied*, 494 U.S. 1060 (1990); *Roper v. State*, 917 S.W.2d 128, 132 (Tex. App.—Fort Worth 1996, pet. ref'd). And in our legal sufficiency review, when faced with a record that supports conflicting inferences about Ramirez's intent, we must presume—even if it does not affirmatively appear in the record—that the jury resolved any such conflict in favor of the prosecution, and must defer to that resolution. *Matson v. State*, 819 S.W.2d 839, 846 (Tex. Crim. App. 1991); *Connell v. State*, 233 S.W.3d 460, 466–67 (Tex. App.—Fort Worth 2007, no pet.).

When viewing the evidence in the light most favorable to the prosecution (as we must in our legal sufficiency review), the circumstances that were established by Rudy's and Stephanie's testimony about what happened on the night in question, as described above, were adequate to allow the jury to infer Ramirez's intent to take money from Pizza Patrón, and we must presume that the jury resolved the conflicting inferences about his intent that were created by other evidence in favor of convicting him and defer to that resolution. *See Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Matson*, 819 S.W.2d at 846. Therefore, we hold that the evidence is legally sufficient to prove that Ramirez committed robbery and overrule that portion of his first issue.

Similarly, viewing the evidence in a neutral light, we cannot conclude that the jury's implicit determination that Ramirez intended to take the money is

clearly wrong or manifestly unjust. *See Steadman*, 280 S.W.3d at 246; *Watson*, 204 S.W.3d at 414–15, 417. The jury was not required to believe any of Sonia's testimony. *See Hernandez v. State*, 161 S.W.3d 491, 500 (Tex. Crim. App. 2005); *Jones v. State*, 984 S.W.2d 254, 257 (Tex. Crim. App. 1998). The jury had a reason not to believe her testimony, which served to imply that Ramirez wanted only to assault Rudy, because even after Rudy had knocked Ramirez out and Ramirez had regained some of his awareness, as Stephanie tried to pick him up, he said, "Give me the money" and asked her, "Where's the money?" Furthermore, even if the jury had believed Sonia's testimony and found that Ramirez was angry at Rudy before entering the restaurant, his desire to "get" or "hit" Rudy does not explain why he would do so under disguise while pretending to be engaged in robbery. Similarly, Ramirez's desire to "get" or "hit" Rudy also does not necessarily preclude his accompanying desire to steal the restaurant's money; he could have accomplished both goals at the same time.

For these reasons, giving "a great degree of deference" to the jury's determination of guilt, we hold that the proof that Ramirez went into the restaurant in disguise, demanded money under threats and with assaultive behavior, and had money in his hands before being knocked out comprises

10

factually sufficient evidence to support his robbery conviction.  *See Steadman*,

280 S.W.3d at 246.   Therefore, we overrule his first issue.

Ramirez's Requests to Change Counsel

In his second issue, Ramirez contends that the trial court erred by denying

his requests to change the counsel who was appointed for him.  We broadly

construe this issue as challenging the trial court's decision, made weeks before

trial, to deny Ramirez's request for different appointed counsel and also as

challenging the court's decision, made on the day of trial, to deny his request

for more time to replace his appointed counsel with retained counsel.

Substitution of appointed counsel

At a pretrial hearing about a month before trial, Ramirez's appointed

counsel told the trial court that Ramirez desired a different attorney.  Ramirez

then explained to the court that he was confused about what his counsel had

told him about the range of punishment for an unrelated offense:

> [THE DEFENDANT:]  With the attorney present, we have not had good communication.  That is the reason.  I have nothing against him.  The only thing is the communication, that it hasn't -- I have a case that, Judge, during the arraignment says to me it is a  lower case, but because of my record, it was put on a state jail felony.
> The attorney here present came to talk to me about that cause.  And I said it was a misdemeanor, but the judge placed it as a state jail felony.  The maximum sentence that you can get is six

11

months to two years.  And the attorney present says to me -- with that same cause and says to me you can get up to 26 years.[5]

. . . .

THE COURT:  Why do you need another attorney?

THE DEFENDANT:  I have had on other occasions other attorneys where we have had good communication.  And with this attorney, it's completely the opposite.  He is stuck on this and this, on this, and he doesn't change.

THE COURT:  Do you have the funds to hire your own attorney?

THE DEFENDANT:  No.  If I had it, I would have already tried to do it.

THE COURT:  Well, that's the problem.  When you have a court-appointed attorney, then you're -- I have to go down the list, like the legislature requires me, and I'll appoint an attorney on that list.  And if they're not qualified, then I won't appoint them.  But Mr. Sain is a very qualified attorney, and I have full confidence in his abilities.

THE DEFENDANT:  Yes, but in this opportunity, I am the defendant, and I can see that he's not doing his job.

THE COURT:  How do you say he's not doing his job?

THE DEFENDANT:  Look, look, missus, when this charge started, I said to him such and such.  I have a lot of witnesses.  Why don't you think about getting an investigator?  The court is

---

[5] The record reflects that Ramirez was charged in a separate case with theft (not associated with the events at Pizza Patrón) that ordinarily would have been a misdemeanor but was charged as a state jail felony and then enhanced further as to Ramirez's punishment range because of his multiple prior convictions.

12

not going to give me an investigator. And it's just negative things that he's bringing along.

Now, I am a man that if I made mistakes, it is not necessary to have a trial. But ever since day one when I saw him, he started talking to me about a trial. And that is why. It's his decision. He's not considering me.

THE COURT: Do you want a trial?

THE DEFENDANT: No. I want -- if the judge, if the court, if we reach an agreement, at no point did I say to the attorney let's have a jury, let's take it to the jury.

. . . .

THE COURT: Okay. Mr. Ramirez, I'm going to deny your request to give you a new attorney. You may not like what your attorney tells you, but he's giving you advice. Whether you follow that advice or not, that's completely up to you. But he will be your attorney, and you need to talk to him because he will be the one preparing your case and taking it to trial.

I'm very confident in his skills as an attorney; otherwise, I wouldn't have appointed him. He's got an investigator. He's working with the investigator on your case. I don't see that he's not doing his job or anything that would require his removal. Therefore, I'm denying your request.

The code of criminal procedure authorizes the replacement of appointed counsel for good cause. *See* Tex. Code Crim. Proc. Ann. art. 26.04(j)(2) (Vernon Supp. 2009). However, "[a]ppointment of new counsel is a matter solely within the discretion of the trial court," and the "trial court is under no duty to search for a counsel until an attorney is found who is agreeable to the accused." *Solis v. State*, 792 S.W.2d 95, 100 (Tex. Crim. App. 1990);

13

*see King v. State*, 29 S.W.3d 556, 566 (Tex. Crim. App. 2000). "A defendant does not have the right to choose appointed counsel, and unless he waives his right to counsel and chooses to represent himself, or shows adequate reasons for the appointment of new counsel, he must accept court-appointed counsel." *Maes v. State*, 275 S.W.3d 68, 71 (Tex. App.—San Antonio 2008, no pet.); *see Renfro v. State*, 586 S.W.2d 496, 499–500 (Tex. Crim. App. [Panel Op.] 1979); *Trammell v. State*, 287 S.W.3d 336, 343 (Tex. App.—Fort Worth 2009, no pet.) ("Texas courts have specifically held that an indigent defendant does not have a right to the counsel of his own choosing.").

The defendant has the burden to prove that he is entitled to new appointed counsel. *See Stephenson v. State*, 255 S.W.3d 652, 655–56 (Tex. App.—Fort Worth 2008, pet. ref'd) (mem. op.). Vague or conclusory allegations are generally insufficient to carry the defendant's burden. *Id.*; *see Maes*, 275 S.W.3d at 71–72.

We conclude that Ramirez did not meet his burden to show that he was entitled to different appointed counsel. Although he was confused about his range of punishment for an unrelated offense, the trial court explained that range of punishment to him. Also, despite Ramirez's assertions that he did not

14

have "good communication"[6] with his counsel and that his counsel "was not doing his job" because, in part, Ramirez alleged that his counsel had not obtained an investigator, Ramirez was not aware that his counsel gained the trial court's approval to hire an investigator months earlier.[7] Finally, although Ramirez said that he did not want to have a trial or take his case "to the jury," Ramirez conceded that his counsel had told him about a twenty-year plea bargain offer and that he had rejected the offer.[8] For these reasons, we hold that Ramirez did not establish good cause for the appointment of different counsel and overrule Ramirez's second issue to the extent that it challenges the trial court's decision not to appoint different counsel for him.

---

[6] ... Ramirez has neither generally claimed that his appointed counsel was ineffective at trial nor adequately specified how his allegedly poor communication with his appointed counsel negatively impacted any particular portion of his trial. *See Malcom v. State*, 628 S.W.2d 790, 792 (Tex. Crim. App. [Panel Op.] 1982) (relating that when a change of appointed counsel is requested but not given, courts should examine the record for whether the appointed counsel's representation had a negative impact on the trial).

[7] ... Ramirez's counsel affirmed that he had met the investigator, had given the investigator the video of Ramirez's robbery and had given the investigator witness interview assignments, and was satisfied with the investigator's progress. Ramirez said that the investigator had not yet spoken with him or Stephanie but admitted that he did not know of other actions that the investigator might have taken.

[8] ... As described below, Ramirez eventually elected the jury to decide his guilt and punishment rather than the trial court.

15

More time to obtain retained counsel

On April 17, 2009, just a few days before Ramirez's trial was set to begin, his counsel tried to visit with him, but Ramirez refused to talk to his counsel and told him that he was fired. Then, on April 20, the day that Ramirez's trial was set to begin, Ramirez's counsel filed a motion to withdraw on the basis that Ramirez wanted to represent himself. Before voir dire began that day, the following exchange occurred:

> THE COURT: Mr. Ramirez, why is it that you don't want to have Mr. Sain as your attorney[?]
>
> . . . .
>
> THE DEFENDANT: The decision, the attorney here present, he made the decision of making it -- of passing it in front of a jury.
>
> . . . .
>
> THE DEFENDANT: I never said to [Ramirez's counsel] . . . that I wanted a jury trial. We never had a good conversation with the attorney. . . .
>
> . . . .
>
> THE COURT: Well, let me ask you this, Mr. Ramirez. Your choices are to have a jury to determine whether you're guilty or not. Or if you choose, I can listen to the evidence and determine whether you're guilty or not. So basically, those are your two choices, and you still have those two choices today.
>
> . . . .

THE DEFENDANT:  No, I'm asking -- I'm asking for an opportunity to hire an attorney.  I know that the judge or the Court is not allowed to have a case such as this, a felony, without an attorney.  That's why I'm asking -- I'm in jail.  I have the opportunity to sell the -- occasion to sell the house that I have in Mexico and to hire my attorney, so that I can be happy with the decision of the Court.

THE COURT:  Well, back on March 27th, 2009, almost a month ago, I told you that you were free to go out and hire your own attorney.  What have you done with regard to hiring your own attorney since then?

THE DEFENDANT:  Look, on that occasion, the attorney was going to send an investigator to visit me.  And I waited for the news of the investigator and the attorney.  It was last week on Friday, last Friday, when he came to visit me.  I said, no, you had time to let me know.  And now, Monday, we're going to court, it's been nine months since I've been in jail.  I gave him evidence, witnesses to the attorney, and he didn't gather them up. . . .

. . . .

THE COURT:  Let me ask you, Have you made any attempts to hire your own counsel since I talked to you about it last month?

THE DEFENDANT:  No, look, I haven't done it . . . .

. . . .

THE COURT:  All right.  Just because you're unhappy with some things that your attorney has said[9] is not sufficient for me to order that you get a new attorney.  He's given you his opinion

---

9 ... Ramirez complained to the trial court about a comment allegedly made by his counsel to Ramirez's family about Ramirez's accepting the State's plea bargain offer so that his family "would have the opportunity to see [Ramirez] die outside" of prison.

17

> on things. He's given you his recommendations. . . . But at this point, it's past the time, we're set for jury trial today, and so I'm not going to allow him to withdraw.
>
> If you had another attorney that you previously hired, ready to go to trial today, I would let you substitute your own attorney in. I believe that's similar to what I told you last month when we had the hearing.

After Ramirez made a final request for one or two weeks' delay of his trial and the trial court denied the request, Ramirez again refused a plea bargain offer from the State and chose the jury to assess his guilt and punishment.

The federal and Texas constitutions guarantee the right to counsel in criminal cases and contemplate the qualified right to obtain paid, nonappointed counsel of the defendant's choosing. *See United States v. Gonzalez-Lopez*, 548 U.S. 140, 151–52, 126 S. Ct. 2557, 2565–66 (2006); *Gonzalez v. State*, 117 S.W.3d 831, 836–37 (Tex. Crim. App. 2003). The right to counsel of the defendant's choosing is not absolute, and a defendant cannot wait until the day of trial to demand different counsel or to request that counsel be dismissed so that he may retain other counsel. *See Gonzalez*, 117 S.W.3d at 837; *Neal v. State*, 689 S.W.2d 420, 427 (Tex. Crim. App. 1984) (stating that "an accused . . . may not use his constitutional right to counsel so as to manipulate the commencement of his trial to suit his convenience and pleasure"), *cert. denied*, 474 U.S. 818 (1985); *Webb v. State*, 533 S.W.2d 780, 784 (Tex. Crim. App. 1976) (explaining that an "accused's right to represent himself or select his

18

own counsel cannot be manipulated so as to obstruct the orderly procedure in the courts or to interfere with the fair administration of justice").

In deciding whether to grant a continuance because of the absence of the defendant's choice of counsel, the trial court should weigh the following nonexclusive factors: (1) the length of delay requested; (2) whether other continuances were requested and whether they were denied or granted; (3) the length of time in which the defendant's counsel had to prepare for trial; (4) whether another competent attorney was prepared to try the case; (5) the balanced convenience or inconvenience to the witnesses, the opposing counsel, and the trial court; (6) whether the delay was for legitimate or contrived reasons; (7) whether the case was complex or simple; (8) whether the denial of the motion resulted in some identifiable harm to the defendant; and (9) the quality of legal representation actually provided. *Ex parte Windham*, 634 S.W.2d 718, 720 (Tex. Crim. App. 1982). We must determine whether the trial court could reasonably have balanced these factors and concluded that the fair and efficient administration of justice weighed more heavily than Ramirez's right to counsel of his choice. *See Rosales v. State*, 841 S.W.2d 368, 375 (Tex. Crim. App. 1992), *cert. denied*, 510 U.S. 949 (1993).

Here, although Ramirez requested only a one or two week delay of his trial, the trial court could have reasonably concluded that the delay would have

19

been much longer because there is no indication that Ramirez had contacted or even researched any particular attorney to handle his case even though he had known for close to a month that he wanted a different attorney. Similarly, nothing in the record shows that Ramirez had money to retain an attorney within the requested delay period (he told the trial court just weeks earlier that he did not have funds to hire an attorney), and the trial court could have been reasonably dubious about Ramirez's potential to sell his house in Mexico within two weeks to gain such money.

Ramirez's counsel was appointed in July 2008, so he had about nine months to prepare for the April 20, 2009 trial. The State had served subpoenas for Ramirez's trial date and had several civilian and law enforcement witnesses prepared to testify on that date.

While the record does not indicate that Ramirez's requested delay was sought for illegitimate reasons or that his robbery case was substantially complex, Ramirez has not adequately identified any particular decision of his appointed counsel, related either to overall strategy or specific tactics during the trial, that resulted in identifiable harm. Although Ramirez argues in his brief that his appointed counsel's representation "affected his ability to accept or decline the State's plea bargain offer of twenty years," the record shows that before voir dire began, Ramirez's counsel obtained a brief recess from the trial

20

court to discuss a plea bargain offer with Ramirez and that Ramirez rejected the offer. Finally, we have not noticed any part of the record showing that Ramirez's appointed counsel provided ineffective representation, and Ramirez has not raised ineffective assistance as an issue on appeal.

For these reasons, we hold that the trial court could reasonably have balanced the *Windham* factors and concluded that the fair and efficient administration of justice weighed more heavily than Ramirez's right to counsel of his choice. *See Windham*, 634 S.W.2d at 720; *Rosales*, 841 S.W.2d at 375. Accordingly, we hold that the trial court did not err by denying Ramirez's motion for more time to retain counsel, and we overrule the remaining portion of his second issue.

Ramirez's Objection to the Courthouse's Display

In his third issue, Ramirez argues that the trial court erred by denying his motion for a mistrial because of the courthouse's allegedly prejudicial display that the jury panel might have seen. He asserts that the display affected his right to a trial before an impartial jury under the Sixth Amendment. *See* U.S. Const. amend. VI; *State v. Morales*, 253 S.W.3d 686, 694 (Tex. Crim. App. 2008) (discussing the Sixth Amendment's "promise of 'an impartial jury'").

During a break in the parties' voir dire of the jury panel, the following colloquy occurred:

21

[DEFENSE COUNSEL]: Judge, it's come to my attention, there's a victim's display down in the first floor. I think it's put on by the D.A.'s, I'm not sure. But there's a display there honoring victims, something like that. And so I would urge that [the display] is prejudicial to the jury panel as they walk in and urge a motion for new trial.

THE COURT: Remind me when we come back from lunch, I'll go down and take a look at it.

The trial court took its lunch break, and when the trial resumed, the judge said,

"During the lunch break, I went downstairs and viewed any displays downstairs. Based on my viewing, I'm going to deny the motion for mistrial."

As we explained in *Grotti v. State*,

A mistrial is an extreme remedy for prejudicial events occurring during the trial process. It is a device used to halt trial proceedings when error is so prejudicial that expenditure of further time and expense would be wasteful and futile. . . . Only when it is apparent that an objectionable event at trial is so emotionally inflammatory that curative instructions are not likely to prevent the jury from being unfairly prejudiced against the defendant is a trial court required to grant a mistrial.

The denial of a motion for mistrial is reviewed under an abuse of discretion standard. The determination of whether a given error necessitates a mistrial must be made by examining the particular facts of the case.

209 S.W.3d 747, 776 (Tex. App.—Fort Worth 2006) (citations omitted), *aff'd*, 273 S.W.3d 273 (Tex. Crim. App. 2008); *see Ladd v. State*, 3 S.W.3d 547, 567 (Tex. Crim. App. 1999), *cert. denied*, 529 U.S. 1070 (2000).

22

Ramirez did not present any evidence about the specific contents of the display to show that it was emotionally inflammatory. He also did not show the proximity of the display to the courtroom where his trial occurred (other than that the display was "down in the first floor"), whether members of the jury panel had to pass by the display to get to the courtroom where the trial occurred, whether any of the members of the jury panel actually noticed the display, or, if they did notice it, how it affected them to the extent that they would have been unfairly prejudiced against him. Under this record, we cannot conclude that the trial court abused its discretion by denying Ramirez's motion for mistrial. *See Grotti*, 209 S.W.3d at 776; *Torres v. State*, 109 S.W.3d 602, 604–05 (Tex. App.—Fort Worth 2003, no pet.) (overruling an appellant's complaint in a DWI case about anti-DWI posters that were located in the lobby of the building in which the appellant's trial occurred because the appellant did not show that any of the jury's members were prejudiced by the posters); *see also Baker v. State*, 797 S.W.2d 406, 408 (Tex. App.—Fort Worth 1990, pet. ref'd) (overruling a challenge to the trial court's denial of a motion for mistrial because the appellant did not meet his "burden to ensure that the activity of which he complain[ed] was made part of a complete record"). We overrule Ramirez's third issue.

## Conclusion

Having overruled each of Ramirez's three issues, we affirm the trial court's judgment.

TERRIE LIVINGSTON
CHIEF JUSTICE

PANEL:  LIVINGSTON, C.J.; WALKER and MCCOY, JJ.

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED:  May 13, 2010